Filed 12/16/15  In re R.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.A., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067890 |
| Plaintiff and Respondent, | (Super. Ct. No. J518847) |
| v. | |
| JESSICA A., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Phillips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel for Plaintiff and Respondent.

Appellant Jessica A. (Mother) appeals a juvenile court judgment terminating her parental rights to her daughter R.A. (born 2010; "the child"). Adoption was selected as the child's permanent plan. (Welf. & Inst. Code, § 366.26; all further statutory references are to this code unless noted.) Mother challenges the sufficiency of the evidence to support the court's finding that no exception to adoption preference applied, i.e., a beneficial parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)

Respondent, the San Diego County Health and Human Services Agency (the Agency) contends the record does not show any lack of supporting evidence or abuse of judicial discretion. The record supports the juvenile court's determinations and we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. Jurisdiction and Disposition; Services Offered

The child came to the attention of the Agency several times before the incident that led to the filing of the current petition in December 2013. Referrals in June 2013 and August 2011 for general neglect and emotional or physical abuse by Mother or the child's father, Michael A. (Father), were inconclusive. (Father's rights were also terminated and he did not appeal.) In July 2013, the Agency substantiated a referral for general neglect, after the child received medical treatment for head injuries and bruises caused by Mother's then-boyfriend, Trevor P. (Trevor), who threw a laptop computer at the child's head. The Agency advised Mother and Father to seek further medical care for her, but

2

they did not do so or follow up with referrals for services intended to mitigate any future risk to her.

In December 2013, Mother left the child with Trevor while she went out to do errands, and when she came home a few hours later, found the child was bruised on her face and could not move her arm. Mother took her to the hospital and talked to social workers, saying that she thought Trevor had changed and would not continue to hurt the child. The child was taken into protective custody and a petition filed under section 300, subdivision (b) (failure to protect). The petition alleged the Agency had advised Mother in July not to allow Trevor to care for the child, but she again did so in December, when she found the child severely bruised on her face, head, and thighs. The medical exam found she had a broken arm, torn membrane in her mouth, traumatic pancreatitis, and healing fractures (right rib and others). The child was detained with the maternal grandparents (the caregivers).

Social workers interviewed Father, who told them he had helped Mother detoxify from heroin once or twice between September and November 2013. According to her sister, Mother had also used methamphetamine. The petition was amended to add allegations under section 300, subdivision (e) (very young child suffering severe physical abuse). Social worker Jorge Nuñez prepared the detention and jurisdictional reports, at first recommending Mother should not receive reunification services, only visitation opportunities. However, after a few visits between Mother and the child, he determined that they interacted well and had a strong bond, and changed his recommendation to allow such services.

3

The court sustained the petition in February 2014 and ordered that both Father and Mother receive reunification services, including counseling and classes. The child continued to be placed with the caregivers. In February 2014, a court appointed special advocate (CASA) volunteer started to work with the child. Mother was given a case plan that included general counseling, parenting education, and random drug testing.

B. Six-Month Review Hearing; Termination of Reunification Services

For the next few months, Mother had weekly supervised visits with the child. Mother was unemployed and did not have a residential address, but kept in touch with notices mailed by the Agency through the caregivers' address. Social worker Carmen Robles, who had evidently replaced Nuñez as assigned to the case, set up on-demand drug tests for Mother six times between December 27, 2013 and June 16, 2014. Mother did not show up, and Robles told her that those no shows were considered dirty tests. As of May 29, 2014, Mother was attending therapy and making good progress. Starting in March 2014, Mother participated off and on in a child abuse counseling program.

As of May 2014, social worker Robles learned from the deputy district attorney who was prosecuting the case against Trevor that there seemed to be a good chance that Mother was living or hanging out with him, or receiving financial support from him. Mother could not remember her residential address because she had recently moved.

In June 2014, Mother asked social worker Robles when she would be allowed unsupervised visits with the child. Robles told her she needed to comply with services and participate in random drug testing and substance abuse assessment. Mother asked for more time, then agreed to go get a test, but did not follow through. Later that month,

4

Robles asked her why, and Mother continued to say that she did not think she should have to submit to drug testing, because that was not why the child was removed from her care.

Before the six-month review hearing in October 2014, Mother kept her weekly appointments for supervised visitation, although she was frequently late and missed five to 10 minutes of the one hour provided. Mother acted appropriately during visits, always bringing new toys for the child that they played with together. The child did not act upset or create any incidents when she left the visitation facility with her caregiver. Sometimes Mother came to visitations in Trevor's car, or she used Father's car to arrive. The Agency was concerned that Mother was still socializing with each of the men and that they were apparently providing her with drugs. Mother was asked to submit to drug testing on August 15, September 12, 23 and 30 and October 8, but she did not show up, or showed up late or without identification.

After Mother provided the Agency with a residential address, social workers visited her there in October 2014, and Robles brought up the missed drug tests. Mother explained she needed to work on her home computer business and did not know when she would get customers. Mother's hands were shaking when she talked and she seemed to have scabs on her face, which she kept rubbing.

In preparation for the six-month review hearing, the social worker recommended that the child continue to be placed with the caregivers, and the parents' reunification services should be terminated. The CASA volunteer concurred. At the six-month review hearing in October 2014, the court considered the evidence and found it would be

5

detrimental to return the child to parental custody, and reasonable services had been provided but would be terminated. The child was continued in placement with the caregivers. The court set a date for selecting and implementing a permanent plan under section 366.26.

Mother filed a request to challenge the orders of the juvenile court at the six-month review hearing. (Cal. Rules of Court, rule 8.452.) However, this Court dismissed the case after her attorney indicated there were no viable issues for review. (*In re R.A.* (dism. Dec. 15, 2014, D066862).)

### C. Permanency Planning Hearing; Ruling

Following the termination of reunification services, Mother continued to communicate with the child by using Skype, once or twice a week for about a half hour, supervised by the caregiver (grandmother). She also called the child and had supervised visitations, missing two out of 16 and being late to most. The caregivers were open to continued contact with Mother even if adoption were ordered.

The hearing on the permanency plan was continued until April 7, 2015, for Mother's attorney to review the visitation logs. In the discussion portions of this opinion, we will outline the evidence presented at the hearing. At this point, we note that the juvenile court heard testimony from Mother, the grandmother caregiver, and Maria Pomier, the social worker who wrote the adoption assessment. Nuñez, the social worker originally assigned to the case, testified that he thought Mother and the child seemed to have a strong bond at the time, which led to his changed recommendation that

6

reunification services be provided for her. He also testified that he had not taken any specialized training about bonding studies.

The court heard argument on the permanency planning issues and admitted into evidence the visitation logs and an e-mail communication between the social workers about whether Nuñez had training in bonding studies (he did not). The Agency represented that things were going well for the child at the home of the caregivers, where she had been placed since the case began. The Agency evaluated the child as adoptable, both specifically and generally. The attorney for Mother argued that it would promote stability and permanency for the child if the court ordered a permanent plan that included Mother in her life, since Mother had consistently acted in a parental role toward her during the time allowed.

At the conclusion of the hearing, the court determined that clear and convincing evidence had been presented to show that the child was likely to be adopted and none of the statutory exceptions, in particular, the beneficial parental relationship exception, applied. (§ 366.26, subd. (c)(1)(B)(i).) The court declined to order guardianship for the reason that it would not provide the child with the same stability as adoption. The parental rights were terminated and the child was referred to the Agency for adoptive placement. Mother timely appealed.

DISCUSSION:  BENEFICIAL PARENTAL RELATIONSHIP

I

*APPLICABLE STANDARDS; FIRST AND SECOND PRONGS*

Mother contends the beneficial parental relationship exception to adoption properly applies to this case.  (§ 366.26, subd. (c)(1)(B)(i); *Autumn H., supra,* 27 Cal.App.4th at p. 575.)  Although she does not argue that the adoptability finding was erroneous, she contends that insufficient evidence supports the court's decision to terminate her parental rights.  Mother argues that a different permanent plan would have been a better option, in light of the affectionate and loving parental role she continued to play in the child's life, although she does not specify what plan would have been more appropriate.

"Regular visitation and contact" are statutory threshold requirements for a claim that a beneficial parental relationship has been maintained.  (§ 366.26, subd. (c)(1)(B)(i).)  The Agency's respondent's brief does not dispute the trial court's finding that Mother made a sufficient showing on the first prong, regular visitation.  However, the Agency argues the court appropriately determined that Mother did not support her claim that the child would substantially benefit from continuation of the parental relationship.  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 810-811.)  To support this exception to adoption, the court must find "a compelling reason for determining that termination would be detrimental to the child."  (§ 366.26, subd. (c)(1)(B); *In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

The juvenile court considers the detriment issue on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship. (*Autumn H., supra*, 27 Cal.App.4th at pp. 575-576; *In re J.C.* (2014) 226 Cal.App.4th 503, 532.) Among the variables to be considered in evaluating the benefits of a parental relationship are the age of the child, the amount of time spent in the parent's care, whether the interactions are positive or negative, and whether the child has particular needs that the parents can best satisfy. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.) It is not enough for a parent to show frequent and loving contact during pleasant visits. (*In re C.F., supra,* 193 Cal.App.4th at p. 555.) More than incidental benefits from maintaining parental contact are required for this exception to apply. (*Id.* at pp. 558-559; *In re Helen W.* (2007) 150 Cal.App.4th 71, 79.)

The court in *In re J.C., supra*, 226 Cal.App.4th at pages 530 to 531 applied a substantial evidence standard of review to the preliminary factual issue of whether the parent has proved any benefits were conferred from her parental relationship with the child. However, as to the weighing test under section 366.26, subdivision (c)(1)(B)(i), in which the juvenile court balances the parent-child relationship against the benefits the child would derive from adoption, the appellate court opined that the abuse of discretion test may apply to evaluate this " ' " 'quintessentially' " discretionary decision.' " (*In re J.C., supra,* at p. 531*; In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) Based on the respective showings, the court balances "the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

9

We examine the record for substantial evidence support for the juvenile court's decision that the beneficial parental relationship exception to adoption should not apply here. (*Autumn H., supra*, 27 Cal.App.4th at pp. 575-577; *In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.) This reviewing court makes presumptions in favor of the judgment, views the evidence in the light most favorable to the prevailing party (the Agency), and gives the judgment the benefit of all reasonable inferences. (*In re C.F., supra,* 193 Cal.App.4th at p. 553; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

### B. Record Evidence

Social worker Pomier was assigned to the case in November 2014, and she prepared the February 17, 2015 adoption assessment report. In it, she noted that the caregiver grandmother said that when the child was first placed with her, the child would slap herself in the face and say "no." The child had healing fractures of various ages, and seemed to be afraid of men at that time. However, she soon became happier and was always comfortable with the caregivers. She sometimes called them "mom and dad."

As of December 2014, the caregivers told the social worker that Mother was still going back and forth between Father and Trevor. They believed that Trevor gave Mother heroin and Father provided her with methamphetamine. Mother appeared to the caregivers to be a "'maintenance user," who consistently used drugs but did not binge on them. Although the caregivers were open to either adoption or guardianship, they preferred adoption because they believed it would best protect the child. According to the social worker, there were 64 possible local adoptive families who wished to adopt a child like this one, in the event the caregivers were not able to adopt. The social worker

10

attempted to ask the child about her view on adoption, but she did not seem to understand the concept.

Mother continued after October 2014 to keep in touch with the child by calling and using Skype, but not on a consistent basis. From December 2014 through mid-January 2015, Mother missed three scheduled meetings with the social worker to discuss the case. When they did meet, Mother said that she had not completed the random drug tests because the social worker had scheduled the tests at inconvenient times, and she had not been given enough time to complete her services, and in any case, she was maintaining her sobriety. Mother said she was not in contact with Father or Trevor. However, in December 2014 and February 2015, she borrowed Father's car to go to visitation. The social worker felt that this continued contact with Father was concerning, because of the parents' history of substance abuse. Trevor pleaded guilty to child abuse in March 2015 and was awaiting sentencing.

In her assessment report, the social worker gave her opinion that Mother's relationship with the child did not appear to be parental in nature, of the kind that would outweigh the benefits of permanency, stability, and safety that adoption could provide to the child. She did not believe there would be detriment to the child if Mother's parental rights were terminated. A February 2015 report by the CASA volunteer stated that the child's physical and emotional condition had improved markedly since the case began, and recommended adoption as a permanent plan. However, it is unclear from the record whether the juvenile court had this CASA report in the file, as it was not admitted into evidence, although the Agency reports were.

11

The social worker testified at the hearing about supervising 16 of Mother's 18 scheduled visits. The child enjoyed spending time and playing with Mother, but did not seem to consistently rely on her for her needs. The social worker never heard the child tell Mother that she missed her or wanted to go home with her. In the social worker's opinion, terminating Mother's parental rights would likely not cause detriment to the child, who seemed to be doing well in her placement and did not ask to see Mother when they were apart.

The grandmother caregiver testified that she was present during Mother's initial visitation appointments and later Skype visits with the child, who knew Mother as "mama." Although there were times that Mother did not show up, her contact with the child was appropriate. Before the child was placed with her, the caregiver had seen Mother under the influence of drugs. Starting immediately upon her placement, the child had no adjustment problems and did not express or seem to have feelings about missing Mother much. She called the caregivers by both types of names (e.g., Grandma or Mom or Mommy).

In Mother's testimony, she explained that she had a strong bond with the child and continued to parent her as much as possible, after removal from her care. She provided for her needs, taught her to clean up the toys, and made her feel safe and secure. Mother's visits were scheduled for one-hour periods, and she acknowledged she was five to 10 minutes late for most of them.

Nuñez, the social worker originally assigned to the case from December 2013 through February 2014, testified he had been employed by the Agency since 2007,

receiving training in placement and permanency issues, structured decisionmaking, substance abuse and child welfare assessment, bias in decisionmaking, and investigation skills. During his observations of visitations between Mother and the child, it appeared to him that they had a strong bond. His conclusions about bonding were based on seeing that during the first two months of visitation, the child became excited when she saw Mother and yelled her name. Nuñez testified the child also got excited when she saw him, yelled his name, and ran to him. His specific training or experience did not include the issue of bonding or adoptions core training.

In its ruling, the court acknowledged that Mother had substantially complied with the visitation portion of the reunification plan, but that there were remaining concerns about visitation. Specifically, Mother had never requested more frequent or longer visitation, or to lift the requirement that it be supervised. The court examined the visitation logs and noted that Mother had acted in a parental role toward the child, showing herself to be more than "an auntie," and to be part of the child's life.

The court then evaluated the mother-child bond as shown by the evidence and found that it was not strong enough to outweigh the child's need for permanence, a need that Mother was evidently not able to satisfy. In particular, Mother had not complied with the drug testing requirement, although there was evidence that drugs were a long-standing problem in her life that she had not yet overcome. Further, the child had transitioned to the caregivers' home without any sleepless nights or any evident distress at being separated from Mother, which suggested that severing her parental bond would not create detriment for the child. The court concluded that the beneficial parental

13

relationship exception to adoption was not supported by the record, and terminated Mother's parental relationship, as well as Father's. The child was referred to the Agency for a permanent plan of adoption.

### C. Application of Criteria: Extent of Beneficial Parental Relationship

Mother contends on appeal that she satisfied her statutory burden of showing the child retained a significant, positive, emotional attachment to her, of a parental nature. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) Even without day-to-day contact and interaction, a parental relationship may be so "strong and beneficial" that "termination of parental rights would be detrimental to the child." (*In re C.F., supra*, 193 Cal.App.4th 549, 555, fn. 5.) " 'Interaction between [a] natural parent and child will always confer some incidental benefit to the child.' " (*Id.* at p. 555.) More than "some measure of benefit" must be conferred through the relationship with the parent. (*Id.* at pp. 558-559.) If the benefit of the relationship are of a nature that substantially promotes the child's well-being, in a manner outweighing the potential well-being to be gained in a permanent home with adoptive parents, then the beneficial parental relationship exception applies. (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)

These proceedings addressed the issue of substantial or incidental benefit from the relationship in several ways. Mother points to her consistent visits and communications with the child throughout the proceedings, and argues she acted in a parental role within the constraints of supervised visitation. (See *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1535-1536 [exception applied and legal guardianship appropriate where the parent had consistently visited and maintained a stable parental role].) Mother accurately points

out that we must evaluate the benefit of her continued contact with the child within the context of the visitation she was allowed. (*Id*. at pp. 1537-1538.) Nuñez, the first social worker on the case, acknowledged that there was a strong bond between mother and child. At that time (Feb. 2014), his report said that there was no evidence that Mother continued to be in a relationship with Trevor, the perpetrator of the abuse, and noted that Mother was likely to remain in the child's life because of the placement with the maternal grandparents. Later, Nuñez disclosed that he based his bonding opinion on his direct observations, but he had not received formal training in bonding studies or adoption assessments.

To the extent Mother relies on *In re S.B.* (2008) 164 Cal.App.4th 289, she cannot show the required similarities. In *S.B.*, this court stated that the beneficial relationship exception does not require that a parent establish that a child's primary attachment was to him or her. (*Id*. at p. 299.) Since we issued our opinion in *S.B.*, we have published other cases that seek to discourage any improper and inaccurate reliance upon that opinion. (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) We have expressly limited the holding of *S.B.*: "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (*In re C.F., supra,* 193 Cal.App.4th 549, 558-559.)

To contend the child substantially benefited from their relationship, Mother cites to *In re Amber M., supra,* 103 Cal.App.4th 681, 690, in which there was a showing by the

15

parent of a "common theme running through the evidence from the bonding study psychologist, the therapists," and the others involved, that Amber's parent retained a strong primary bond with her children, despite their placement out of her home. In that case, this court reversed a judgment adverse to the mother, because the evidence supported her contention that she was entitled to further proceedings on whether the beneficial parental relationship exception applied. There, a bonding study conducted by a psychologist had concluded that the mother and the older child shared a primary attachment, such that it could be detrimental to sever their relationship. (*Id*. at p. 689.) The younger children also maintained strong attachments to her. This Court found it significant that the mother had visited the children as often as she was allowed, was devoted to them, and "did virtually all that was asked of her to regain custody." (*Id*. at p. 690.) Moreover, that hearing process had been very fragmented over a period of months, and the record did not then support the juvenile court's ruling that declined to apply the beneficial parental relationship exception. (*Id*. at p. 691; § 366.26, subd. (c)(1)(B)(i).)

Even accepting the record evidence that Mother's relationship with the child was mainly parental in nature, the record also showed that she never progressed beyond supervised visitation and never requested increased visitation. There were times that she missed visits or was late to them. It is "day-to-day interaction, companionship and shared experiences" that define a parental role in a child's life. (*In re L.Y.L., supra,* 101 Cal.App.4th 942, 954.) The circumstances of this case are not closely analogous to those in *Amber M.*, *supra*, 103 Cal.App.4th 681, 689-691. Instead, from the outset of her

16

placement with these caregivers, this child was thriving in their care, without any significant adjustment difficulties, and there was no evidence that she had retained a primary attachment to Mother. This set of hearings was not unduly fragmented. Rather than doing "all that was asked of her" by the Agency (*id*. at p. 690), Mother did not comply with any of the 12 calendared drug tests, but continued to express her opinion that she should not have to submit to drug testing, and that drugs were not the reason that the child was removed from her care.

Mother's viewpoint about the supposedly minimal role played by her reported substance abuse is not supported by the record. The Agency was consistently provided with information that Mother was still in touch with Father and Trevor throughout the proceedings, was using their cars, and presumably had continuing access to drugs through them. The Agency's warnings about the July 2013 incident of abuse at Trevor's hands had failed to assist Mother, and by December 2013 and thereafter, she was unable to make the needs of the child a priority. It is not possible to conclude from this record that Mother's reported substance abuse was not a factor in the circumstances leading to the dependency proceedings. Although she did not benefit appreciably from the reunification services provided to her, the record does not demonstrate that the services offered were wholly inappropriate in light of the issues that had previously interfered with her ability to provide a safe home for the child.

It is an extraordinary case in which an older child's enduring bond with a parent is entitled to be preserved despite the parent's significant shortcomings, and in which the evidence shows it would be harmful to the child to interfere with that enduring bond.

17

(See, e.g., *In re Scott B.* (2010) 188 Cal.App.4th 452, 471.) Mother generally argues that some other permanent plan than adoption should have been ordered, but she does not point to evidence in the record showing that it would be detrimental to this relatively young child to sever her ties with Mother. (*In re C.F., supra,* 193 Cal.App.4th at p. 555.) Mother did not bring forward evidence to show that her relationship with the child would promote her well-being to such a degree " 'as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re J.C., supra*, 226 Cal.App.4th at p. 528.) Minor's counsel has filed a letter brief on appeal, supporting the Agency's position that the judgment should be affirmed.

Moreover, the juvenile court had an adequate basis in the record to conclude that the child did not have special needs that only Mother could satisfy. (*In re Angel B., supra,* 97 Cal.App.4th at p. 467; *Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.) The court did not abuse its discretion in concluding that Mother's relationship with the child was not dominantly a substantial, primary emotional attachment, and that severing it would not be detrimental to her. (*In re J.C., supra*, 226 Cal.App.4th at pp. 528-529; see *In re C.F.*, *supra*, 193 Cal.App.4th 549, 553-554.) The court performed the appropriate balancing analysis, and substantial evidence supports its finding that the second prong of the beneficial parent-child relationship exception was not met. (§ 366.26, subd. (c)(1)(B)(i); *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947.)

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

McDONALD, J.

19